# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**KATELYN MARIE TATTOLI,**

    **Plaintiff,**

**v.**                                             Case No:    6:16-cv-1578-Orl-31DCI

**UNITED STATES OF AMERICA,**

    **Defendant.**

## BENCH OPINION AND ORDER

On September 8, 2016, Katelyn Marie Tattoli ("Plaintiff") filed suit against the United States ("Defendant") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, *et seq.* Plaintiff's Complaint (Doc. 1) seeks damages resulting from an accident in Osceola County, Florida on January 3, 2014. Defendant conceded liability for the accident and a bench trial on damages was held on April 9-10, 2018. A transcript of the trial has been prepared and the parties submitted post-trial memoranda on June 29, 2018 (Docs. 102 and 103).[1]

I.     <u>The Accident</u>.

About mid-day on January 3, 2014, Plaintiff was driving her Kia Forte westbound on Nolte Road in Osceola County, Florida. Liza Santiago, driving a USPS vehicle southbound on Old Hickory Road, failed to stop at the stop sign and collided with Plaintiff's car. The severity of the impact caused Plaintiff's car to flip over and become a total loss.

---

[1] The trial transcript over two days is contained in Doc. 97 (Day 1) and Doc. 98 (Day 2). Reference to the transcript will be by document number followed by the page number. The parties introduced numerous joint exhibits which will be refenced by exhibit number (Ex. __), followed, where applicable, by the specific Bates page number.

Plaintiff claims that she lost consciousness after the collision. When she regained consciousness, she was hysterical because she could not find her dog, which had been ejected from the vehicle. Plaintiff checked on the driver of the USPS vehicle and called 911. When EMS arrived, Plaintiff complained of pain in her neck, chest, abdomen, back and right shoulder. Doc. 97 at 51. She was put in a neck brace and taken to the hospital.

At Osceola Regional Hospital Plaintiff claims to have been terrified and in shock. *Id.* at 60. She complained of head, neck, back and abdominal pain at a level of 7 out of 10. *See* Ex. 2 at 10. Various tests were run and a CT image was taken, which revealed no acute fracture or dislocation. She was diagnosed with a concussion, and cervical and thoracic back strain. She was prescribed medications and sent home later that day. *Id.* at 78-89.

After returning home, she continued to experience pain in her neck, back, and left shoulder. Doc. 97 at 62. She also continued to have headaches. *Id.* She stayed home and rested for a couple weeks before returning to work. *Id.* at 63.

II. <u>Post-Accident Treatment</u>.

Plaintiff began chiropractic treatment with Dr. Petty on January 10, 2014. Doc. 97 at 248. Upon initial presentation, Plaintiff complained of back pain, neck pain, and pain in her left shoulder. *Id.* at 249. After administering six orthopedic examinations, Dr. Petty confirmed that five were positive for injury, resulting from trauma. *See id.* at 253. The range of motion in Plaintiff's neck was abnormal. *Id.* Dr. Petty's initial diagnosis included neck sprain, thoracic and lumbar back sprain, a tension headache, and muscle spasm. *Id.* at 254. After 36 visits, Plaintiff was still suffering from neck pain and pain radiating into her left arm and shoulder, so Dr. Petty referred Plaintiff to Dr. Nathan Hill in August 2014. *Id.* at 254-56. She later concluded that Plaintiff's injury was caused by the accident and was permanent. *Id.* at 260-262.

Dr. Hill ordered an MRI of Plaintiff's left shoulder and cervical spine in September 2014. These images showed a tear in Plaintiff's left rotator cuff. *See* Ex. 5 at 163. With respect to Plaintiff's neck, the radiologist, Dr. Landau, found objective evidence of a midline posterior disc herniation at the C6-7 level. *Id.* at 164. Dr. Hill agreed with Dr. Landau's diagnosis, *see* Ex. 4 at 503, and gave Plaintiff a cortisone injection in her left shoulder to alleviate her shoulder pain, Doc. 97 at 69.[2]

In January 2015, Plaintiff was referred to the spine and brain neurosurgery center where she treated with Dr. Hussain and Dr. Razack for her neck problem. Doc. 97 at 70. Dr. Hussain, who confirmed the disc herniation at C6-7, performed an EMG study with showed a mild left C-7 radiculopathy. She recommended an epidural injection, but Plaintiff initially declined out of fear for the procedure. But, with no relief from her pain, Plaintiff returned for the epidural in June 2016 which provided some relief for about six months. Doc. 97 at 73-74. Plaintiff went back for a second epidural in May 2017, but that injection provided no relief. *Id.* at 74.

In November 2017, Plaintiff decided to undergo surgery. On November 29, 2107, Dr. Razack performed a left C4-5 and C6-7 osteotomy. Ex. 6 at 3810.[3] The procedure was performed from the back of Plaintiff's neck which left a visible 3 1/2-inch vertical scar. Doc. 97 at 77. The surgery was partially successful in relieving her migraine headaches. She got feeling back in her hand and she could feel herself "progressing for the first time in four years." *Id.* at 78. But she still has an occasional migraine, neck pain, and limited range of motion in her neck. *Id.*

---

[2] Dr. Petty also reviewed this MRI and observed a disc herniation at C6-7. *Id.* at 258.

[3] Dr. Cutler would characterize this procedure as a laminotomy. Doc. 98 at 146.

III. Plaintiff's Life – Before and After.

At the time of the accident, Plaintiff was a healthy 22-year-old female who exercised regularly, including CrossFit training. She liked to hunt and rode horses several times per week. She was a riding instructor and a competitive barrel racer in rodeos throughout Florida and Georgia. Doc. 97 at 38. She was employed as a 911 operator by the Osceola County Sheriff's Office, with hopes of becoming a deputy someday. *Id.* at 40. Except for a broken foot in 2013, Plaintiff had never been injured and had no problems with her back, neck or shoulder. *See id.* at 36.

After the accident, she experienced migraine headaches and persistent pain in her neck and shoulder. She endured painful treatment and became anxious and frustrated. Unable to engage in her prior active lifestyle, she became angry and withdrawn, Doc. 97 at 72, and felt like a toddler/spectator – not needed. *Id.* at 82. Since January 3, 2014, her exercise has been limited to walking her dog. *id.* at 83, and she needs help with daily activities, *id.* at 85. Because she can't do the things she used to do, she has lost her sense of independence and has become a recluse. *Id.* at 84. She is despondent that she will never return to being normal. *Id.* at 85.

IV. Causation.

Under the FTCA, the Court applies the substantive law of the forum state. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994). Under Florida law, causation is an element of a negligence claim. *Jeffries v. Amery Leasing, Inc.*, 698 So. 2d 368, 370-371 (Fla. 5th DCA 1997). Thus, Plaintiff must show that Defendant's negligence caused her injuries. In addition, to recover non-economic damages (pain and suffering), Plaintiff must prove that she suffered a permanent injury. *Wald v. Grainger*, 64 So. 3d 1201, 1207 (Fla. 2011).

Defendant concedes that the accident caused some injury, but contends it was limited to minor strain which should have resolved in a couple months. Doc. 103 at 4. Plaintiff, however,

contends that the accident caused a herniated disc at level C6-7 of Plaintiff's neck (a permanent injury)[4] which required extensive treatment, including two epidural injections and surgery.

The MRI of Plaintiff's neck in September 2014 read by Dr. Landeau (radiologist) and confirmed by Dr. Hill showed a disc herniation at the C6-7 level. Ex. 5 at 164-65. Dr. Petty concurred with this diagnosis. Doc. 97 at 258. Dr. Hussein also read this MRI and found a herniation at C6-7, with possible cervical radiculitis. Ex. 6 at 138. The EMG test in February 2015 was consistent with Plaintiff's symptoms and evidenced an injury at the C6-7 level of Plaintiff's spine. Doc. 97 at 189-91. Another MRI taken on December 2, 2015, still showed the disc herniation at C6-7. *Id.* at 197. The EMG was repeated in July 2017 and confirmed a nerve injury at C6-7. *Id.* at 200-01. During the surgery in November 2017, Dr. Razack used high-powered magnification to visualize Plaintiff's spine, which verified the C6-7 disc herniation. *Id.* at 201-03. The goal of the surgery was to decompress the nerve root at the affected levels of Plaintiff's cervical spine.[5] As for causation, Dr. Razack said that in his opinion, the disc herniation at C6-7 was caused by the accident in January 2014. *Id.* at 206-08. This herniation caused injury to the left C5 and C7 nerve roots, resulting in neck, shoulder, and arm pain, necessitating surgery. *Id.*

To support its theory that Plaintiff sustained only minor injuries in the accident, Defendant presented the testimony of Dr. Scott Cutler, an expert in neurosurgery. *See* Doc. 98 at 50-57.[6]

---

[4] Defendant tacitly concedes that a herniated disc would be a permanent injury.

[5] Although the herniation at C6-7 was the primary concern, a bulge or herniation at C4-5 was also addressed.

[6] Dr. Cutler devotes about 18-20% of his professional time to expert witness testimony, 95% of which is on behalf of defendants. He charges $1,000 per hour for his time. He does not profess to be a shoulder expert. Doc. 98 at 128.

Based on his review of the records, Dr. Cutler notes a degenerative process at cervical levels 3-4, 4-5, and 5-6, but no herniations.[7] Indeed, Dr. Cutler believes that Plaintiff's C6-7 disc is perfectly normal. Doc. 98 at 85-87. In sum, Dr. Cutler concedes that Plaintiff has a permanent condition – degenerative disc disease – that is not related to the accident, and that the accident did not cause a disc herniation in Plaintiff's neck. *Id.* at 166.[8]

The problem with Defendant's theory is that Plaintiff's symptoms did not resolve in a few months, but persisted for years. Defendant attempts to explain this anomaly by suggesting that Plaintiff is a malingerer and that her extensive medical treatment was a ruse to support this lawsuit. But Plaintiff's treating physicians saw no sign of malingering, Doc. 97 at 205, and the Court rejects this contention.[9] Moreover, the notion that Plaintiff would undergo this extended path of serious and painful treatment in order to set up a claim against the United States is nothing short of preposterous. Absent an explanation as to why degenerative disc disease would cause these symptoms, unrelated to the accident, the logical conclusion is that the accident caused a herniation in level C6-7 of Plaintiff's neck and this conclusion is supported by the greater weight of the evidence.[10] Therefore, Plaintiff sustained a permanent injury as a result of the accident.[11]

---

[7] Dr. Landau also saw no disc herniation at C4-5. *See* Ex. 4 at 489-90. Dr. Cutler disagrees with Dr. Landau's observation of a herniation at C6-7, Doc. 98 at 84, and finds support in two MRIs by Dr. Hartker taken in December of 2015 and May of 2017, which found no disc protrusion at C6-7, but did find a disc protrusion at C4-5, Ex. 6 at 118, 3480.

[8] Degenerative disc disease in a person Plaintiff's age is unusual. To support this diagnosis, Dr. Cutler speculates that the disease may have been caused by her equestrian activities which create axial loading on the discs. Doc. 98 at 71-73.

[9] Dr. Petty testified that Plaintiff was in pain the entire time of her treatment between January and August 2014. Doc. 97 at 254-55.

[10] Defendant concedes that a level C6-7 herniation could be caused by trauma and could cause pain in the area itself, as well as radicular pain. *See* Doc. 98 at 121.

[11] This injury manifests itself in pain, a loss of range of motion in Plaintiff's neck, and a 3

V.   Damages.

Having resolved the causation dispute, the Court turns to the issue of damages. Plaintiff seeks to recover for her medical expenses and pain and suffering, both past and future.

   A.   **Medical Expenses**.

   1.   *Past*. The parties stipulated that Plaintiff's total medical expense is $57,494.08 after setoffs. This includes four years of medical treatment, multiple injections, several MRI films, EMG/nerve conduction studies and surgical intervention.

   With respect to Dr. Razack, he charged $25,058 for the surgery on Plaintiff's neck. Ex. 6A at 3835-36. Defendant's expert, Dr. Cutler, testified that he would have charged only $8,096 for the surgery. Doc. 98 at 104-05. The Court concludes that $15,000 is a reasonable amount for this procedure. Plaintiff's past medical expenses, therefore, will be assessed at $47,436 ($57,494 - $10,058 = $47,436).

   2.   *Future*. Dr. Razack testified that Plaintiff will need future medical care for the next five to seven years, including an annual visit with a spine specialist and an MRI scan annually to check the alignment of her neck, as well as the discs and their morphology. Doc. 97 at 211.[12] An annual visit would cost $750 and the MRI would cost $1,500, *id*. at 212, for a total of $2,250 per year. Dr. Razack also testified that Plaintiff may need physical therapy from time to time during that same period of

---

1/2-inch scar on the back of her neck.

   [12] The need for pain management is too speculative to be included in the Court's calculation of future medical expenses.

time. Doc. 97 at 211.[13]   Dr. Petty testified that a reasonable sum for continued therapy would be $2,500 per year. *Id.* at 263.   Thus, the total annual cost would be $4,750 ($2,250 + $2,500 = $4,750) and using six years as a reasonable period of time, Plaintiff's future medical expense totals $28,500 ($4,750 x 6 = $28,500).

B.  **Pain and Suffering**.

1.  *Past*.  Plaintiff clearly suffered through four years of pain, painful treatment, and a marked decline in the quality of her life.   There is no objective way to measure this loss.   Plaintiff's counsel suggests $100/day for 1,557 days for a total of $155,700.   In the absence of a specific response from Defendant, the Court finds this suggestion to be reasonable.

2.  *Future*.  Calculation of Plaintiff's pain and suffering in the future is problematic because it is impossible to see into the future.   Plaintiff's pain and discomfort could resolve over time, stay the same, or get worse.   Admittedly, the surgery gave her significant relief.   Her migraines now are "few and far between" and she got feeling back in her hand. Doc. 97 at 78.   Although she still has neck pain and limited range of motion, *id.*, by January 2018 she was pretty much able to resume normal activities, *id.* at 89.

Plaintiff has a life expectancy of another 56 years and Plaintiff's counsel requests future pain and suffering of $8,000 per year for the duration of Plaintiff's life.   But, Plaintiff's improvement since surgery, and her need for continuing care for only five to seven years, undermines this request.   The Court concludes that

---

[13] Plaintiff is presently undergoing physical therapy. Doc. 97 at 78.

$100,000 is a reasonable and appropriate estimate of Plaintiff's future pain and suffering.

**C. Summary.**

The Court calculates Plaintiff's damages at:

| | |
|---|---:|
| Past Medical Expenses | $ 47,436 |
| Future Medical Expenses | 28,500 |
| Past Pain and Suffering | 155,000 |
| Future Pain and Suffering | 100,000 |
| Total | $330,936 |

VI. <u>Conclusion</u>.

As a result of Defendant's negligence, Plaintiff suffered a permanent injury from the accident on January 3, 2014. Accordingly, it is

**ORDERED** that judgment be entered for Plaintiff and against the United States in the amount of $330,936.00.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 3, 2018.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party